PANTANO, *Respondent—Cross-Appellant,*
*v.*
OBBISO, *Appellant—Cross-Respondent.*
(No. 403-212, SC 24661)
580 P2d 1026

Gino G. Pieretti, Jr., of Souther, Spaulding, Kinsey, Williamson & Schwabe, Portland, argued the cause for

appellant—cross-respondent. With him on the briefs was Ridgway K. Foley, Jr., Portland.

Michael J. Walsh, Portland, argued the cause and filed the briefs for respondent—cross-appellant.

Bernard F. Vail, of Northwestern Legal Clinic, Portland, filed a brief amici curiae for Oregon Woman Lawyers' Caucus, Oregon Council for Women's Equality, Oregon Women's Political Caucus.

Before Denecke, Chief Justice, Bryson and Linde, Justices, and Gillette, Justice Pro Tempore.

*GILLETTE, J. Pro Tempore.*

**GILLETTE, J.,** Pro Tempore.

Plaintiff sought to impose a constructive trust on all funds from a joint savings account formerly owned by plaintiff's deceased wife, Giovanna (Ginny) Pantano and her sister, defendant Maria Obbiso, which funds had been placed in new accounts for the benefit of defendant Maria Obbiso and her children. The trial court found for plaintiff in the amount of $13,500, together with interest. Defendant appeals. Because after a laborious *de novo* review of the extensive and confusing record in this case, we are not convinced that plaintiff has established the existence of facts justifying the imposition of a trust, we reverse.[1]

This suit involves members of two Italian-American families—the Pantanos and the Obbisos. Ginny Pantano died on October 2, 1973. She had been married to plaintiff Pete Pantano for 35 years. The Pantanos had no children of their own, although Mr. Pantano had two children from a previous marriage to whom Ginny was not particularly close. Pete worked for the railroad from 1937 until his retirement in 1959. Ginny never worked, but began receiving some income—apparently social security benefits—in 1965. These payments eventually totalled $9,173.92. As of her death, the Pantanos had savings in a joint account amounting to $12,892.

Throughout her lifetime, Ginny was very close to her younger sister, Maria. Maria had been married to Sam Obbiso for 51 years. Sam is a tailor and has worked in different jobs from 1928 to the present. Maria is also a tailor and has worked with her husband on and off throughout their marriage. The Obbisos have two children—Dino and JoAnn—with whom Ginny was very close.

Both Ginny and Maria had reputations for being extremely thrifty. Pete Pantano brought his paychecks home and turned them over to his wife who

---

[1] Plaintiff cross appeals, contending that he is entitled to a larger sum, $29,511.35. Our disposition in this case renders plaintiff's cross-appeal moot.

then took out money as needed for bills and expenses. Sam Obbiso paid the bills and expenses himself and then turned the rest of his money over to Maria. All the money that Maria earned herself, she kept.

Shortly after Ginny's death, Pete found two bank savings books issued to Ginny and Maria in their maiden name (Stallone). As of September 23, 1973, the two accounts held approximately $27,000. This prompted plaintiff to claim that both his wife and Maria had conspired to defraud him of his money and that the sisters' joint accounts were furnished from funds drawn from the Pantano household. Maria, on the other hand, insists that except for $2,000 that Ginny contributed from her pension to the accounts in 1970, all the money in the joint accounts had been deposited by her. She indicated that the sisters used the joint accounts in the Stallone name as a way of insuring that the funds would go to Mrs. Obbiso's children upon the death of either sister. They were both afraid to leave any of this money to their husbands for fear the men would remarry other women and deprive the children of the money.

■ In his complaint plaintiff set out allegations of fraud and undue influence in connection with his request that the court impose a constructive trust over the funds in the joint accounts. A finding of fraud or undue influence is not a prerequisite to the imposition of a constructive trust:

> "A constructive trust arises where a person in a fiduciary or confidential relationship acquired or retains property in violation of his duty to the grantor. The confidential relationship must be one in which the grantor justifiably can and does rely. It is not necessary to prove fraud or intent not to perform by the fiduciary or confidant." (Citations omitted.) *Albino v. Albino,* 279 Or 537, 550, 568 P2d 1344 (1977).

Assuming that Maria would be accountable under the confidential relationship between plaintiff and Ginny, in order to sustain his cause of action, plaintiff must

still prove that Maria has acquired legal rights to property (plaintiff's money) by "questionable means," which she "ought not, in equity and good conscience hold and enjoy." *See Marston v. Myers et ux,* 217 Or 498, 509, 342 P2d 1111 (1959). Quoting 54 Am Jur. Trusts, 167, § 218. Simply put, plaintiff needs to prove that it was his money that funded the sisters' joint accounts.

Proof of a conduct creating a constructive trust must be by strong, clear and convincing evidence—evidence that is of "extraordinary persuasiveness." *Hughes v. Helzer,* 182 Or 205, 224, 185 P2d 537 (1947); *Albino v. Albino, supra* at 550. With regard to constructive trust, "clear and convincing evidence means that the truth of the facts asserted is highly probable." *Id.* at 550; *Thom v. Bailey,* 257 Or 572, 481 P2d 355 (1971).[2]

In the case before us, plaintiff's proof falls short: plaintiff is unable to show by even a preponderance of the evidence that any specific or definite amount of his money was deposited by Ginny into the sisters' joint accounts.

Plaintiff approaches his proof problem by marshalling the evidence in such a way as to raise the inference that the money in the joint accounts is his. He first points out that he and Ginny only had $12,000 in their joint savings account at her death and argues that he should have more money than that; therefore, the money in the sisters' accounts must be his. His argument is buttressed by the findings of the referee and the conclusions of the trial judge. The referee found that, based on plaintiff's lifetime earnings plus the pension incomes of plaintiff and Ginny, their total lifetime earnings would be $117,440.69. The trial judge relied on the referee's findings and estimated that because of the Pantano's savings propensity, they

---

[2] *But see Byers v. Santiam Ford, Inc.,* 281 Or 411, 574, P2d 1122, (1978). (Lent, J., concurring) (questioning usefulness—and—legality—of clear and convincing standard in fraud cases).

would have saved approximately 50 percent of their earnings or $59,000. Recognizing that the plaintiff's only savings account at the time of Ginny's death contained $12,000, the trial judge concluded that the savings in the sisters' joint accounts would raise the Pantanos' life savings to a realistic and logical level.

Plaintiff takes a second tack and argues that not only does he not have enough money, but that the Obbisos have too much. Plaintiff looks at the amount of money the Obbisos have accumulated over their lifetime and asserts that the total savings figure is unrealistic in light of the Obbisos' total lifetime earnings. The referee estimates the Obbisos' total lifetime earnings to be $131,260.[3] As of September/October, 1973, (the time of Ginny's death), the Obbisos' combined savings amounted to approximately $48,000.[4] If Maria also contributed $25,000 to the $27,000 joint account she held with her sister, this would mean that, added together, she and Sam had saved approximately $73,000—a little more than one-half their lifetime earnings. Plaintiff argues that this is unrealistic.

To bolster his position that it is unrealistic to expect that the Obbisos would have saved over half their lifetime earnings, plaintiff asserts several propositions, not all of which—upon close examination—carry the persuasive power he claims for them: (1) Plaintiff made more money than Sam Obbiso. This is true, but he did not make more money than Sam and Maria together: Plaintiff made $117,440 (which includes $9,000 of his wife's pension money); the Obbisos made $131,260. (2) Ginny Pantano was more thrifty than Mrs. Obbiso. This is not borne out by the record; rather, the evidence indicates that both women were

---

[3]The referee's report actually listed the Obbisos' combined lifetime earnings as $107,544. The referee conceded that he had inadvertently forgotten to add in $23,716 of social security benefits, which when added in, brings the total earnings figure to $131,260.

[4]Maria had $28,000 in savings accounts listed in her name. Sam had $20,000 in a savings account under his name.

indeed thrifty. (3) Neither JoAnn nor Dino (defendant children) contributed substantially to the Obbisos' savings. We disagree. The trial judge stated that there was evidence that JoAnn and Dino did contribute some money to their parents, but that he did not think that the weight of the evidence established that JoAnn contributed a "substantial amount of money" to the Obbisos. The record indicates that Dino gave Mrs. Obbiso $6,000, before he married. The record also indicates that, until she first married, JoAnn turned her paychecks over to her mother. After that, she and her family lived on and off with her parents and contributed monthly amounts for room and board.[5] We think the evidence is clear that—whether substantial or not—Mrs. Obbiso received additional income from her children.[6]

In sum, plaintiff's attempt to lay claim to the money by negating the possibility that it is Mrs. Obbiso's is less than convincing. Nor was plaintiff successful in his attempt to identify the money in the joint accounts as his. The inference that the money must be his because he should have $59,000 and only has $12,000 is just that: an inference. It is not a persuasive one.

It is not surprising that plaintiff was less than specific in pointing to what portion of the funds in Maria's hands belonged to him. Neither the parties nor

---

[5] From the record, these contributions could have amounted to approximately $13,000.

[6] Plaintiff also points out that the Obbisos bought a car and spent $10,000 to remodel their house—apparently suggesting that, with such expenditures, they could never have saved over one-half their income. We note that plaintiff does not apply the same logic to his own case. His expenditures were estimated at 50 percent of his earnings. But, defendants suggest that plaintiff may have severely underestimated his expenditures. Cross-examination established that, in estimating his expenses, plaintiff had not included money for travel (admittedly inexpensive), repairs to his house, taxes, medical bills and other incidental expenses. Nor was it ever resolved whether plaintiff's estimate of expenses included money paid out for property taxes. At any rate, we do not think the amounts spent to purchase a car and remodel their house are necessarily inconsistent with the Obbisos' estimated savings.

the trial judge were ever able to pinpoint the precise amount of money over which the parties were arguing.

After hearing all the evidence, the trial judge referred the matter to a referee and, after adopting the referee's report, concluded that the plaintiff sustained his burden of proof and "that a portion of the funds contained in paragraph 7 of his complaint" were the plaintiff's. The court imposed a constructive trust over the funds kept by Maria in three separate accounts in the Far West Bank up to the amount of $13,500.

How the trial judge arrived at the $13,500 figure is not entirely clear. Plaintiff had alleged in paragraph 7 of his complaint that Maria had withdrawn "a sum in excess of $35,000" from the joint accounts. In his brief on his cross appeal, plaintiff claims that he is entitled to $29,571.35 which he alleges is the amount withdrawn from the joint accounts by Maria at the time of Ginny's death. However, the chronological developments in the record suggest that a figure of approximately $27,000 is the amount at issue. The sisters closed their first account in 1972 with a withdrawal of $13,584 and closed their second account in January, 1973, with a $13,399 withdrawal. They then redeposited $26,000 of the money in three other joint accounts, and deposited an additional $3,000 on September 12, 1973, bringing their total joint savings to $29,000. Maria then withdrew these funds on September 25, 1973. She apparently (the evidence is not entirely clear) redeposited $27,168 of these funds in three new accounts in December, 1973, January, 1974, and January, 1975, in the Far West Bank. One of the accounts was set up in her name as trustee for her son, another in her name as trustee for her daughter, and a third in her name only. These were the sums over which the trial court imposed the constructive trust.

The figure $27,000 coincides with the amount of money in the sisters' two joint accounts which they closed in 1972 and 1973 and also approximates the

amount Maria redeposited after closing their subsequent joint accounts in September, 1973.

The use of the $27,000 figure would explain how the trial court arrived at the $13,500 figure—it is one-half of $27,000—but not why. Defendant candidly admits in its trial brief that it is not sure how the trial court arrived at its determination, but suggests that merely dividing $27,000 in half is the most plausible conclusion. Plaintiff, on the other hand, suggests that the trial court had subtracted the Obbisos' social security benefits ($23,716) from the amount found by the referee to be in the accounts at the time of Ginny's death ($37,304.44), in order to arrive at $13,500. The balance by this approach would be approximately $13,588. We do not know the court's rationale. We do think this puzzle is indicative of the weaknesses in the entire case.

The only thing that is clear is that the parties were never able to identify the precise amount of money subject to litigation. Nor was plaintiff ever able to identify what amount of money in the joint accounts was his. Merely dividing the pot in half is not the proper solution.

It may be, as plaintiff contends, that some or all of the money which eventually found its way into the sisters' joint accounts originally came from plaintiff. The difficulty is that the plaintiff's evidence does not establish this fact, even by a preponderance of the evidence. We recognize that, given the lifestyle of the parties, plaintiff faced an enormous burden in showing the source of the funds. Sympathy for plaintiff's evidentiary problems, however, is not a substitute proof. It would require us to descend into conjecture to find for plaintiff, and this we cannot do.

Reversed.