Filed: November 1, 2012

IN THE SUPREME COURT OF THE STATE OF OREGON

STATE OF OREGON,

Plaintiff-Appellant,

v.

LORRAINE ELIZABETH SARICH,

Defendant-Respondent.

(CC 10060997; SC S059928)

En Banc

On appeal from orders of the Linn County Circuit Court under ORS 138.060(2).

Dennis J. Graves, Judge.

Argued and submitted April 30, 2012.

Anna M. Joyce, Solicitor General, Salem, argued the cause for plaintiff-appellant. With her on the briefs was John R. Kroger, Attorney General.

Peter Gartlan, Chief Defender, Office of Public Defense Services, Salem, argued the cause and filed the brief for defendant-respondent.

DE MUNIZ, J.

The orders of the circuit court are affirmed, and the case is remanded to the circuit court for further proceedings.

1

DE MUNIZ, J.

In this case, we review a trial court's orders declaring defendant's son, Z -- a 19-year-old man who suffers from autism and developmental disabilities -- not competent to testify at trial and excluding from evidence a video involving out-of-court statements made by Z and drawings made by Z.  For the reasons that follow, we affirm both orders.

I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Defendant is charged with the aggravated murder of William Mills (also known as Bill Mills).[1]  On the day the victim was last seen, in January 2007, the victim had been scheduled to work in defendant's home as a caregiver for defendant's son, Z.  The victim was reported missing the following day.  The police located the victim's car in a parking lot at Chemeketa Community College, where the victim had been enrolled as a part-time student.  However, the police could not locate the victim.  Nine months later, in October 2007, the victim's skeletal remains were found in a remote forested location at the end of an unpaved spur road.  No clothing was found with the body.  It was

---

[1]    This case is before this court on the state's pretrial appeal pursuant to ORS 138.060(2)(a).  As such, the facts underlying the offense have not yet been proved by the state and are presented only as necessary to give context to the issues presented in this appeal.  By contrast, the facts pertinent to the issues on review are taken from the trial court's findings regarding the evidence presented at hearings on those matters.  Although we review the trial court's orders for legal error, we defer to the trial court's factual findings to the extent that they are supported by any evidence in the record.  In the absence of explicit findings with regard to any pertinent fact, we presume that the trial court decided the fact in a manner consistent with its ultimate legal conclusion.  *See State v. Foster*, 303 Or 518, 529, 739 P2d 1032 (1987) (citing *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968)).

determined that the victim's death had been caused by a gunshot wound to the head.

Around the time of the victim's disappearance, the police began to focus their investigation on defendant after discovering that defendant had been under investigation for a series of fraudulent financial activities involving a shell corporation set up using the victim's name. In an interview with police, defendant denied any knowledge of or involvement in the victim's death. Defendant claimed that, because the victim had not shown up for work on the day of his disappearance, she had had to take Z with her to a doctor's appointment that day. Defendant told the police that Z had been with her that entire day and that they had spent the majority of the day at the doctor's office.

In January 2010, nearly three years after the victim's disappearance, a police detective interviewed Z. At those interviews, Z allegedly made four statements that: "Bill was shot"; "Bill shot in the tree forest"; "Bill was shot in the side"; and "there's no clothes with Bill." In addition, Z produced eight drawings during the course of the interviews, which may be summarized as follows:

1. A "drawing" with the words "bill blood" in large letters on an otherwise blank sheet of paper, written by Z, according to the state's representations, while "explaining to [the detective] that Bill, the victim, was covered in blood in [the] tree forest[.]"

2. A drawing by the detective of a simple figure representing a human body, with a single line extending out from the side of the figure's abdominal area; the line was drawn by Z, according to the state's representations, in response to questioning regarding where the victim had been shot.

2

3. A drawing by Z on the back of an envelope depicting the face of a person, apparently wearing glasses, with the words "Dark Green Car," "Bill Hurt Gun," and "Tree Forest" written above the face. Z's caregiver told police that Z had made the drawing, unprompted, at his home following one of the interviews with the detective.

4. A drawing by Z of a rudimentary human figure, apparently with short hair, glasses, and a goatee or beard, which the state contends depicts the victim.

5. A drawing by Z that appears to depict a barrel and trigger apparatus (without a stock) of a rifle-style gun.

6. A drawing made by the detective of three rough sketches of a car, a pickup truck, and a sport utility vehicle, next to the words "Dark green," "Dark green," and "Gray," respectively; the state represents that the words were added by Z during the interview to describe the dark green car driven by the victim, the dark green truck driven by defendant, and the gray sport utility vehicle driven by defendant's then-boyfriend.

7. A drawing by Z depicting a boxy-shaped vehicle parked among a number of trees and three stick-type human figures, two standing next to each other by one of the trees and one apparently lying on the ground. The figure on the ground has a sort of looping line extending downwards from its side, and one of the standing figures appears to have long hair.

8. A drawing by Z of a figure with short hair, glasses, and what appears to be a goatee or beard, with a short line extending out of its side, which the state

3

represents was intended to show where the victim was shot. As a result of the statements and drawings made by Z at the three interviews, the detective suspected that Z may have been an eyewitness to the victim's death.

In May 2010, the police (along with Department of Justice investigators) determined that they would attempt to generate evidence demonstrating Z's knowledge of the location where the victim's remains had been found by asking Z to ride in a vehicle with a Department of Justice agent and another police detective while giving them driving directions to that location. The detective videotaped the entire expedition, which lasted approximately four hours. However, due to Z's difficulty with verbal communication, many of Z's directions were given in response to leading questions or suggestions by the investigators, and the meaning of his statements and gestures is not always entirely clear. Additionally, on a number of occasions, Z directed the investigators to take wrong turns. When those wrong turns resulted in dead ends, or when it became clear to the investigators that they were no longer heading towards the correct location, the investigators themselves decided to turn around and return to the last correct intersection, where Z was then given the opportunity to indicate another direction. Near the end of the trip, after a number of wrong turns, the detective directed the driver to take the correct road without Z's assistance. The video then shows the investigators commenting to Z or amongst themselves within Z's hearing that Z had "finally found the right road," that the turn-off they were looking for should be "3.9, almost 4 miles" down that road, and, directly before approaching the correct spur road, that they "guess[ed] it's got to be coming up close." Z then appears to recognize the spur road leading to the

location where the victim's remains were found, pointing and stating in an excited manner something sounding like, "It this is."

Shortly after recording that video, the state indicted defendant for aggravated murder. At defendant's bail hearing, the state presented evidence of Z's interviews with the detective and Z's alleged direction of the investigators to the location where the victim's remains had been found. Defendant subsequently requested a hearing to examine Z's competency to testify at trial. At that hearing, a psychologist specializing in autism and developmental disorders who had examined Z testified about Z's ability to perceive and communicate:

"And so he is able to answer * * * very nicely simple questions, but it needs to be in formats that he is familiar with. Questions that are usually asked in courtrooms are usually what we refer to as W questions, who, what, why, when, where, those types of questions. And the -- [Z] is a very concrete thinker and is able to answer questions that are very concrete in nature. So he could answer questions like did a particular person do a particular thing. He can answer a question like show him a picture and say is this, and then you name the object or you name the incorrect object, and he can accurately answer yes or no, whether that object is the one you answered or not. He can affirm whether he has seen things before or not. And he can do those things, in my opinion, reliably.

"He can't answer if you -- he can't answer typical questions that you and I can easily answer like, 'Who was at the scene of the crime, describe the scene of the crime.' There's types of things -- he doesn't have that type of vocabulary.

"My estimate is that he has a preschool vocabulary at this point that is very visual. And he can -- he makes word estimates, which means that he is very strong at pronouncing the front end of a word, less so about the back end. As a result, I find communicating with him that it's easiest to have him point to something, a picture or a series of pictures, have him select the right answer and point to it so that he's -- I make sure that I am understanding the word estimate that he is using. * * * But his vocabulary is kind of preschoolish. So any questions asked of him need to be more

5

him affirming or not affirming. Something he saw or identifying something rather than a traditional who, what, why, when, where type of questions."

The psychologist also testified that Z has trouble understanding verbs and pronouns due to the abstract nature of those concepts, and that Z is "pretty distractable" and "needs to be cued to stay on task because he is in some ways emotionally younger than his stated age." However, the psychologist also testified that many autistic people have "extremely good visual skills and visual memory," and that from preliminary testing, she had concluded that Z's visual memory is "very much intact" and perhaps even better than the average person's. The psychologist suggested that a number of accommodations could be made to courtroom and hearing procedures to maximize Z's ability to focus, communicate, and generally function as a witness in a courtroom setting.

After consulting with defense counsel and the state, the trial court ordered that most of the psychologist's suggested accommodations be implemented for the duration of Z's examination. The next day, Z was brought into the courtroom and questioned by the trial court in an effort to determine his competency. The trial court began by asking Z very simple yes or no questions regarding the identification of tangible objects held out in front of him:

"THE COURT:  Okay, I brought some things with me for you to look at.

"Z:  Yeah.

"THE COURT:  Do you know what this is?

"Z:  *(indiscernible)*

"THE COURT:  Is this a -- is this a book?

6

"Z: Yeah.

"THE COURT: This is a book. Good job. Is this a pen?

"Z: Yes. Yeah.

"* * * * *

"THE COURT: Yes. All right. Is this a banana?

"Z: No. It's red.

"THE COURT: It's red.

"Z: Apple.

"THE COURT: Apple, correct. I am holding up an apple for you to look at. All right. That works pretty well."

The trial court then asked a series of questions that involved somewhat more abstract concepts beyond a yes or no identification of an object within Z's immediate visual perception:

"THE COURT: Am I in a swimming pool?

"Z: Yeah.

"THE COURT: Am I swimming in a pool right now?

"Z: Okay. *(indiscernible)*

"THE COURT: Are we in a swimming pool, are we in water right now?

"Z: Yeah. *(indiscernible)*

"* * * * *

"THE COURT: Did you ride in a car to come here today.

"Z: Yeah.

"THE COURT: Do you have shoes on your feet.

"Z: Yes.

7

"THE COURT:   Yes.  Do you see a tree in this room.

"Z:   Yes.

"THE COURT:   Do you see a tree?

"Z:   Yes. *(indiscernible)*

"* * * * *

"THE COURT:   Look at my wrist.  Do I have a watch on?

"Z:   Yeah.

"THE COURT:   Yes?  Is this a glass of water?

"Z:   No.  A pencil.

"THE COURT:   It's a pen, it's not a glass of water.  All right. Thinking about water again.  Can you look at me?  Are we in a swimming pool right now?

"Z:   Yes.

"THE COURT:   Yes?  Are we indoors now or outdoors?  Indoors?

"Z:   Outdoor.

"THE COURT:   Outdoors?

"Z:   Yes.

"THE COURT:   Can you see the sky?

"Z:   Sky.

"THE COURT:   Can you see the sky?

"Z:   Yeah. *(indiscernible)*

"THE COURT:   If I was to say I am holding a watermelon, would that be true?

"Z:   Yeah.

"THE COURT:   That would be true?

8

"Z: Yes.

"THE COURT: If I was to say I am sitting on an elephant, true or not true?

"Z: True.

"THE COURT: True?

"Z: Yeah.

"THE COURT: Do you see an elephant?

"Z: Yeah.

"THE COURT: Do you know how old you are?

"Z: Yeah.

"THE COURT: How old are you?

"Z: *(indiscernible)*

"THE COURT: Can you tell me how old you are?

"Z: *(indiscernible)*

"THE COURT: Are you -- are you 35?

"Z: Yeah.

"THE COURT: Yes?

"Z: Yeah. *(indiscernible)*

"THE COURT: This man standing next to you, is his name Joe? Is that Joe?

"Z: No.

"THE COURT: No? What's that man's name?

"Z: Cameron.

"THE COURT: Cameron. Correct. Can you look at me?

"* * * * *

"THE COURT: * * * If I was to say right now I am wearing a football helmet, do I have a helmet on my head?

"Z: Yeah.

"THE COURT: Yes? Do you see a helmet?

"Z: Yes.

"THE COURT: Yes. Is this a television that I am holding in my hand?

"Z: Tissue.

"* * * * *

"THE COURT: Tissues. Correct. If I was to say I am riding a bicycle, do you see a bicycle in the room?

"Z: Yeah. *(indiscernible)*"

At that point, the prosecutor requested a hearing outside of Z's presence. The prosecutor objected to the manner in which the court was questioning Z:

"* * * I don't think he understands the questions. I think they have to be, from what little I know, they have to be much shorter and much more direct and concrete. And I don't know how we can do this, but I think perhaps the Court may not be getting a really accurate assessment of the witness's capabilities given his verbal limitations that [the psychologist] talked about. And I -- it's not as though I have a suggestion how to remedy that. I wish I did but I don't."

The court responded that it had been purposefully testing what the psychologist had said about the limitations of Z's ability to communicate:

"I was testing what [the psychologist] had said purposefully after I got some yes/no answers to determine if [Z] really had vocabulary to identify something. In saying, 'What is this,' just for my own understanding and to perhaps get some insight into his capabilities. And so I did that purposefully after I gave him some softball questions, if you will, yes/no.

"I tried to think of some questions that would involve a no answer because it seemed like he was giving a yes answer kind of repeatedly. And

10

when I tried to test his ability to understand the difference between telling the truth and not telling the truth, I asked some questions, for instance was I in a swimming pool. Perhaps that's too complex a term for him. And so I would be happy to try those kinds of questions with simpler concepts other than yes/no if it's possible.

"I want to be confident that he has the ability to understand questions and can give honest, truthful answers. And all of the issues in this case are not going to be with small words. And obviously this is a very very serious case. And so I was deliberately testing somewhat beyond the limits of what were [*sic*] suggested. Because he clearly got the yes/no thing pretty much in the beginning with simple objects.

"* * * * *

"And I could obviously sort of allow him softballs so that he could answer yes to -- to get to that issue. But I think it's a more complicated issue, the concept of telling the truth versus not telling the truth than simple yes/no answers. And I felt I needed to probe a bit more in order to have a firm understanding in my own mind whether I thought he understood the difference between the truth and not."

The court then offered the prosecutor an opportunity to question Z. Z was brought back into the courtroom and the prosecutor attempted another line of questioning:

"Q. Okay. [Z], my name is Scott.

"A. Scott.

"Q. Scott. Is Scott's jacket white?

"A. *(No audible response)*

"Q. Is Scott's jacket white?

"A. Blue.

"Q. Your shirt is blue. Is Scott's jacket, is that white?

"A. No.

"Q. Do you know what color it is?

"A. White.

11

"Q. Yeah, your T-shirt is white. What color is this?

"A. Black.

"Q. Black? Okay. If I said Scott's jacket is white, would that be true or false?

"A. *(No audible response)*

"Q. Would that be true or false?

"A. True.

"Q. That would be true?

"A. Yeah, true.

"Q. Okay. [Z], it's hard when your mom's here, huh?

"A. *(No audible response)*

"Q. Okay. Can you -- Your Honor, I believe it is a catch 22, because I don't think he can continue with having direct eye contact with his mother. And his mother obviously has a constitutional right to have direct eye contact. So I don't have any further questions."

The court excused Z from the hearing and made the following findings, culminating in the conclusion that Z had been unable to demonstrate the minimum level of competency necessary to satisfy the legal requirements to testify as a witness:

"My impressions of [Z] are that he is a very sweet young man. And I think he was doing a great job in trying to follow the questions that I was asking, and [the prosecutor's] questions as well.

"It was clear to me that he could identify objects when I gave him a yes/no opportunity. He was able to say some words. * * * And his sense of sight[,] in terms of the ability to perceive, was working just fine. And of course he was able to hear my questions.

"I didn't get to the point of recall in terms of showing him something again to see if he could recall that I had shown it to him earlier, because I -- I was trying to deal with the issue of truth and not truth.

"But it's true that I used a concept that was probably too advanced

12

for him in terms of swimming pool. But the doctor had mentioned the word elephant yesterday, and so I used the word elephant, and he said that I was sitting on an elephant. I didn't put it in terms of, 'Is Judge sitting on an elephant?'

"He did say that he saw a tree in the courtroom. And of course he did say that we were outdoors instead of indoors and he could see the sky. Perhaps the question about a helmet was beyond his ability to communicate about. But the record shows what it shows.

"I simply cannot find him to be a competent witness for the -- as far as the legal requirements are concerned in this particular trial based upon what I have seen up to this point."

The court later issued a written order declaring Z not competent to testify, citing OEC 601-603.

After the competency hearing, the state filed a motion asking the trial court to rule that the video and the statements and drawings made by Z at the interviews with the detective were admissible. Although that evidence consisted of Z's out-of-court statements, the state argued that the evidence was not hearsay, because the state was not offering it to prove the truth of the matters asserted (that the victim was shot, in the side, in the forest, at the location to which Z directed the investigators). Rather, the state maintained, it sought to admit the evidence to prove Z's *knowledge* of those matters. According to the state, Z's knowledge of the location where the victim was found and how the victim was killed was relevant to prove that Z was present at the scene of the crime. That in turn, the state contended, was relevant to the issue of defendant's guilt because, along with defendant's statements that Z was with her all day on the day the victim disappeared, it tended to prove that defendant was also present at the scene of the crime.

13

Defendant responded that admitting Z's out-of-court statements would violate her rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution because Z would not be available for cross-examination due to the trial court's competency ruling. The state countered that, under federal law, the Confrontation Clause bars only the use of hearsay evidence -- and that the evidence that it sought to admit was not hearsay because it was not offered to prove the truth of the matters asserted, but rather to prove Z's knowledge of those matters. After hearing argument, the trial court issued an order excluding from evidence the video, statements, and drawings. The trial court held that the evidence was "inadmissible under *Crawford v. Washington*, 541 US 36, 124 S Ct 1354[, 158 L Ed 2d 177] (2004) because [Z] is unavailable for cross[-]examination after the Court's previous competency ruling" and, alternatively, that the evidence was "inadmissible under OEC 403 in that it would be unfairly prejudicial to the defendant, would confuse the issues and mislead the jury."

The state then filed its interlocutory appeal directly to this court under ORS 138.060(2)(a), assigning error to both the order declaring Z not competent to testify at trial and the order excluding from evidence the video, Z's statements, and Z's drawings.[2]

## II. DISCUSSION

### A.  *Z's Competency*

---

[2]    The state's notice of appeal to this court also included a third order of the trial court that granted defendant's pretrial motion to exclude from evidence a number of prior bad acts allegedly committed by defendant. However, the state's brief before this court does not raise or argue that issue, so we do not consider it.

Whether a person is competent to be a witness is a preliminary question for the trial court to decide under OEC 104, which states generally that "[p]reliminary questions concerning the qualification of a person to be a witness * * * shall be determined by the court." The trial court's order indicated that it found Z not competent to testify at defendant's trial under OEC 601, OEC 602, and OEC 603.

OEC 601 provides the general standard for witness competency:

"Except as provided in [OEC 601-606], any person who, having organs of sense can perceive, and perceiving can make known the perception to others, may be a witness."

OEC 602 provides in relevant part that "a witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Finally, OEC 603 requires in pertinent part that, "[b]efore testifying, every witness shall be required to declare that the witness will testify truthfully, by oath or affirmation administered in a form calculated to awaken the conscience of the witness and impress the mind of the witness with the duty to do so."

The state and defendant differ over this court's standard of review of a trial court's determination of witness competency. Both the state and defendant cite *State v. Rogers*, 330 Or 282, 4 P3d 1261 (2000), in support of their positions. According to the state, *Rogers* signals that such evidentiary rulings are reviewed at the outset for errors of law. Defendant, however, cites *Rogers*, 330 Or at 312-13, 313 n 9, for the proposition that the trial court's express and implied findings of fact from an OEC 104 hearing bind the reviewing court as long as the record contains sufficient evidence to support the findings. From that passage in *Rogers*, defendant reasons that our standard of review of a

15

trial court's determination of witness competency must be for abuse of discretion. That reasoning is consistent with the legislative commentary to OEC 601, which states that witness competency is a "a question for the trial court to decide in the exercise of its sound discretion." *See* Legislative Commentary to OEC 601, *reprinted in* Laird C. Kirkpatrick, *Oregon Evidence* § 601.02, Art VI, 430 (5th ed 2007). *See also State v. Mohler et al.*, 115 Or 562, 569, 237 P 690 (1925), *reh'g den*, 239 P 193 (competency of a witness is a preliminary question of fact for the trial court to determine and will not be reviewed except for abuse of discretion).

Both parties are partially correct. In *Rogers* this court explained that appellate review of evidentiary rulings may involve the application of several standards of review:

> "From the foregoing, we glean several principles. First, in the context of evidentiary rulings, 'discretion,' as this court has used that term, refers to the authority of a trial court to choose among several legally correct outcomes. If there is only one legally correct outcome, then 'discretion' is an inapplicable concept. It follows that we first must review evidentiary rulings without deference to determine whether proper principles of law were applied correctly. Next, and also without deference, we must determine whether application of those principles leads to only one correct outcome. If there is only one legally correct outcome, and the trial court arrived at that outcome, then it did not err; conversely, if the trial court arrived at a different outcome, then it did err. Only if we determine that application of the correct legal principles leads to more than one correct outcome do we continue to review whether the trial court abused its discretion in choosing an outcome. If the trial court's decision was within the range of legally correct discretionary choices and produced a permissible, legally correct outcome, then the trial court did not abuse its discretion. Accordingly, appellate review of rulings on the admissibility of evidence may involve the application of several standards of review, depending on the particular ruling and assignment of error at issue."

330 Or at 312 (footnote omitted).

16

We conclude that our review involves a two-step process. First, we determine whether the trial court applied the correct legal standard for determining competency. Second, if the trial court applied the correct standard, we review the record to determine whether the trial court abused its discretion in determining competency.

The state argues that the trial court erred by questioning Z in a manner that exceeded the boundaries of the types of simple, concrete questions that the psychologist had advised that Z could understand. As a result, according to the state, the trial court erred in finding Z not competent to testify, "because, rather than considering [Z's] competency *in light of* the limits on the manner in which he communicates, it found him incompetent *because of* the limits on the manner in which he communicates." (Emphasis in original.)

The state attempts to analogize the trial court's failure to abide by the proposed limitations on the format and content of its questions to Z to a trial court refusing to permit a witness who cannot speak English to testify via an interpreter. We do not find the comparison apt. Although OEC 601 states a very liberal standard of competency, that standard requires that the witness's ability to perceive and make perceptions known to others encompasses the sort of perceptions that will be relevant to the issues to be decided at trial.

The proper inquiry is not whether the person is able to perceive and communicate in *any* capacity, but rather "[w]hether [the] person has sufficient ability to perceive, recollect and communicate *so it is worthwhile for the person to testify*." Legislative Commentary to OEC 601, *reprinted in* Kirkpatrick, *Oregon Evidence* at 430

17

(emphasis added). OEC 601 does not require that a person be able to communicate in any particular form, manner, or language, but it does require witnesses to be able to "make known the[ir] perception[s] to others" in *some* manner. OEC 601. Although a non-English speaker is perfectly capable of making his or her perceptions known to others through an interpreter, the accommodations that the state contends Z requires to communicate would effectively prevent the attorneys from eliciting any useful information from Z with regard to the many perceptions that would be relevant to this case. Those limitations would effectively exclude most questions involving intangible actions, past events, persons and objects not present at trial, distances, times, dates, and locations, all of which could and likely would require some degree of comprehension of abstract concepts.

We conclude that the OEC 601 legal standard permitted the trial court some latitude to tailor the competency inquiry to the anticipated circumstances of the trial. On the facts of this case, the trial court did not err in the questions it posed to Z, or in basing its competency determination on Z's inability to respond coherently to the kind of questions that would be relevant to the issues in this case.

Although it was apparent from the trial court's interactions with Z that Z had some ability to perceive, Z's ability to communicate his perceptions to others was severely limited. Z could accurately answer a yes or no question regarding the name of an object presented to him. However, his responses to the trial court's questioning demonstrated that he would be unable to answer accurately more abstract or complex questions. Z's inability to respond to those sorts of questions supported the trial court's

18

determination that Z would be incapable of testifying in a way that would be useful at trial.

Based on the foregoing, we conclude that the trial court did not abuse its discretion in determining that Z was not competent to testify at trial, and the order of the trial court determining that Z was not competent to testify at trial is affirmed.

B.    *Admissibility of the Video, Z's Statements, and Z's Drawings*

Notwithstanding the trial court's determination regarding Z's competency, the state also seeks to introduce at trial the video of Z allegedly directing investigators to the site where the victim was found, as well as four statements and eight drawings made by Z in the course of his interviews with the detective.  As noted above, the trial court held that that evidence was inadmissible on two grounds:  First, the evidence would violate defendant's rights under the Confrontation Clause of the Sixth Amendment due to the court's prior ruling that Z was not competent and thus unavailable to testify; and second, under OEC 403, the probative value of the evidence was substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury.

In accordance with this court's usual methodology of considering issues of state law before issues of federal law, and issues of statutory interpretation before issues of constitutional interpretation, we first consider the trial court's exclusion of the evidence under OEC 403.  *See, e.g.*, *State v. Spada*, 286 Or 305, 309, 594 P2d 815 (1979) ("It is basic that determination of Oregon statutory law is antecedent to any claim under the federal constitution, because the State does not violate any of a defendant's constitutional

19

rights if, under this court's interpretation of the controlling statutes, those rights are in fact protected.").  Because we determine that the trial court did not abuse its discretion in excluding the evidence under OEC 403, we have no need to, and do not, consider whether the admission of that evidence would violate the Confrontation Clause of the federal constitution.

OEC 403 provides that a trial court has discretion to exclude evidence under OEC 403 if the trial court finds that the probative value of the evidence is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay or needless presentation of cumulative evidence."  Although we review for errors of law whether the trial court properly applied the standard contained in that statute, we review the trial court's ultimate determination of the balance of factors under that standard for abuse of discretion.  *See* *State v. Shaw*, 338 Or 586, 614-15, 113 P3d 898 (2005).

In its motion *in limine* and at the pretrial hearing on its motion, the state grouped the video and Z's statements and drawings as a single proffer.  It has long been the rule in this state that, when a party offers evidence as a whole and the evidence is rejected by the trial court, the appellate court will affirm the trial court's ruling if any part of the evidence is inadmissible.  *See* *State v. Jones*, 339 Or 438, 441, 121 P3d 657 (2005) ("As a preliminary matter, we note that the state did not argue to the trial court that differing circumstances surrounding each interview provided separate grounds for admitting the evidence pertaining to each interview.  The state bore the burden to preserve for appeal any alternative argument supporting the admissibility of any part of

20

the evidence."  (citation omitted)).  Because the state did not separate its evidentiary offer, or otherwise raise specific arguments regarding the admissibility of each of the different forms of evidence, and does not do so now in this court, if any part of the state's evidence is inadmissible, we will affirm the trial court's decision to exclude all of the evidence.

In this case, we need only consider the video that allegedly depicts Z leading investigators to the scene of the murder.  Although the video is probative only to the extent that it exhibits Z's independent knowledge, the video is riddled with suggestive remarks and leading questions by the investigators that could have indicated to Z which way to point and when.  In addition, the fact of Z's knowledge is probative of defendant's guilt only if the factfinder makes a series of assumptions and inferences, and even then results in only circumstantial evidence of guilt.  To rely on that evidence, the factfinder first would have to determine that, notwithstanding the suggestiveness apparent on the video, Z already had independent personal knowledge of the location to which he purportedly directed the investigators on the tape.  Second, the factfinder would have to assume that Z gained that knowledge by accompanying the murderer to that location nearly three years earlier, and not from some other source.  Third, the factfinder would have to assume that it was defendant, and not some other person, who took Z to that location.[3]  Finally, even assuming that the factfinder did make all of those inferences and

---

[3]     The state contends that a factfinder could base that inference on statements by defendant that Z was with her all day on the day the victim disappeared.  However, the

21

assumptions, the proposed evidence still provides only circumstantial evidence of defendant's guilt, because it establishes only that defendant was present at the location where the victim's body was found. To determine the ultimate issue of guilt from that evidence, the factfinder would have to make the additional assumption or inference that, even if defendant was present at that location, that it was defendant, and not another person also present, who caused the victim's death.

The trial court reasonably could have concluded that the video presented a danger of unfair prejudice to defendant. Although the state does not offer the video for its truth, admission of the video would nevertheless create a substantial risk that the jury would improperly consider that evidence for its truth, resulting in significant unfair prejudice to defendant. The state argues that that risk of unfair prejudice to defendant is not significant, because the state intends to establish the truth of those matters with other evidence. However, our review of the record does not demonstrate that the state will be able to present evidence independently establishing the truth of all of those matters. Specifically, the record does not appear to contain any direct evidence at this point that the victim was shot at the place where the victim's remains were found. Indeed, the state itself appears to assume the truth of those matters in arguing that Z's "knowledge" of those facts indicates that he must have witnessed the murder.

Furthermore, the trial court also reasonably could have concluded that the

record contains no direct evidence, so far as we have been able to ascertain, that the murder took place on that day or that the victim was taken to that location on that day.

22

video posed a high danger of misleading the jury and confusing the issues at trial. Although the evidence is only conditionally relevant to establish a fact from which a factfinder could circumstantially infer defendant's guilt, its presentation at trial would likely consume a significant amount of time and likely also would provoke lengthy and complex presentations by defendant to impeach that evidence, followed by additional responsive presentations by the state to attempt to rehabilitate it. The disproportionate amount of attention that would be required to determine what Z knew could easily confuse or mislead the jury into giving disproportionate weight to that issue, and thus distract the jury's attention from the ultimate issue of defendant's guilt.

Because there is evidence that supports the trial court's conclusion that the probative value of the video was substantially outweighed by the danger that the video would be unfairly prejudicial, would confuse the trial issues, and would mislead the jury, we conclude that the trial court did not abuse its discretion in excluding the video under OEC 403.

As described above, the state offered the video, Z's statements, and Z's drawing as a whole, and did not make specific arguments regarding each piece of evidence. Because we conclude that the trial court did not abuse its discretion in excluding the video tape under OEC 403, and because the state did not offer Z's statements or drawings separately or raise specific arguments regarding the admissibility of those items of evidence, we affirm the trial court's order excluding Z's statements and Z's drawings as well.

The orders of the circuit court are affirmed, and the case is remanded to the

circuit court for further proceedings.