Argued and submitted January 17, affirmed April 17, 2013

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JEFFREY JAMES COLLINS,
*Defendant-Appellant.*

Clackamas County Circuit Court
CR9911591; A147269

300 P3d 238

Eric Johansen, Senior Deputy Public Defender, argued the cause for appellant. With him on the briefs was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Andrew M. Lavin, Assistant Attorney General, argued the cause for respondent. With him on the answering brief were John R. Kroger, Attorney General, and Anna M. Joyce, Solicitor General. With him on the supplemental brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Ortega, Presiding Judge, and Nakamoto, Judge, and De Muniz, Senior Judge.

DE MUNIZ, S. J.

**DE MUNIZ, S. J.**

In this criminal case, we review the trial court's order denying defendant's motion *in limine* to exclude eyewitness identification evidence. In denying the motion, the trial court determined that a pretrial photographic lineup was not unduly suggestive under the test set out in *State v. Classen*, 285 Or 221, 590 P2d 1198 (1979). Following the pretrial hearing, defendant entered a conditional guilty plea to public indecency, reserving the right to appeal the denial of his motion.

While this case was pending in this court, the Oregon Supreme Court decided *State v. Lawson / James*, 352 Or 724, 291 P3d 673 (2012), in which it substantially revised the *Classen* test.[1] The question before us, then, is whether, under *Lawson / James*, the trial court committed reversible error in determining that the eyewitness identification evidence was admissible.[2] For the reasons that follow, we conclude that the trial court did not err in denying defendant's motion *in limine*. Accordingly, we affirm.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On the evening of March 9, 1999, Wyland was driving her car on Interstate 205 (I-205).[3] Wyland's 12-year-old daughter, Payne, and her daughter's 12-year-old friends, Burns and Christensen, were in the backseat of the car. As

---

[1] We granted the parties leave to file supplemental briefs in light of *Lawson / James*.

[2] Neither party argues that it would be inappropriate to apply the framework set out in *Lawson / James* to this case. Generally, "[t]he 'benchmark' for error is the law existing as of the time the appeal is decided." *State v. Jury*, 185 Or App 132, 137, 57 P3d 970 (2002), *rev den*, 335 Or 504 (2003); *see also State v. Wesley*, 254 Or App 697, 295 P3d 1147 (2013) (applying the *Lawson / James* framework in an appeal challenging the trial court's order denying the defendant's pretrial motion to exclude eyewitness identification evidence that was decided by the trial court under *Classen*).

[3] We take the facts from the trial court's findings regarding the evidence presented at the pretrial hearing on defendant's motion *in limine*.

"Although we review the trial court's orders for legal error, we defer to the trial court's factual findings to the extent that they are supported by any evidence in the record. In the absence of explicit findings with regard to any pertinent fact, we presume that the trial court decided the fact in a manner consistent with its ultimate legal conclusion."

*State v. Sarich*, 352 Or 600, 602 n 1, 291 P3d 647 (2012).

they proceeded down the middle lane, a black Nissan pulled up along the driver's side of Wyland's car. Wyland noticed the Nissan because it was dark outside and the dome light was on inside the Nissan. The Nissan slowed, went behind Wyland's car, and then came up along the passenger's side. When the girls suddenly began screaming, Wyland realized that the driver of the Nissan was exposing his genitals and masturbating. Wyland followed the Nissan until she was able to record the license plate number. She then reported the incident to the Oregon State Police (OSP). Upon receiving the report, OSP Trooper Lidey ran the license plate number and discovered that defendant was the registered owner of the Nissan.

A. *1999 police interview with the victims*

On the evening of the incident, Lidey interviewed Wyland and the three 12-year-old girls. The victims described the driver as a Caucasian male of average build in his early thirties. They also stated that he had short, dark hair. Christensen and Burns noted that the driver had a very pale face. Although Wyland could not recall whether the driver had facial hair, the girls stated that he did not. The victims described the driver's car as a black Nissan with rear-end damage, a missing rear bumper, and a trunk held closed by bungee cords.

That same evening, OSP Sergeant Swift contacted defendant at his residence. Defendant admitted that he owned a Nissan and that he had possessed the car all day. He also admitted that he had driven on I-205 that evening, but recalled no involvement with the victims. Swift photographed defendant, who had a 5 o'clock shadow at the time. After Swift informed defendant that the photo would be used for identification purposes, defendant responded, "Of course she'll recognize me. I was there."

Using the information provided by Wyland, Lidey identified defendant as a suspect and composed a pretrial photographic lineup according to standard OSP policy.[4] Lidey

---

[4] According to Swift's testimony, OSP policy at the time required construction of a "six-pack," a photographic lineup consisting of the suspect's DMV photo and five DMV photos of nonsuspects. In selecting the nonsuspect photos, the objective was to find persons whose appearance approximated that of the suspect as he

obtained a DMV photo of defendant, portraying defendant with a 5 o'clock shadow. Because Lidey was using defendant's DMV photo, she selected five DMV photos of other men that she believed matched defendant's DMV photo—and not the victims' description of the driver—so that defendant's photo would not stand out. All of the photos were in black and white. Defendant's photo was in position number five. The first photo was of a Caucasian male with hair longer than defendant's hair, and who appeared to be heavy-set. The second photo was of a male with a mustache and who appeared to have a darker complexion than defendant. The third photo was of a Caucasian male with no facial hair, with hair longer than defendant's hair, and who appeared to be heavy-set. The fourth photo was of a Caucasian male with long hair and a full beard. Finally, the sixth photo was of a male with a mustache who appeared to have a darker complexion than defendant.[5]

B.  *1999 out-of-court identification* (Pretrial photographic lineup)

On March 22, 1999, 13 days after the incident, Lidey showed the photographic lineup to Wyland and the three 12-year-old girls. All of the victims identified defendant as the driver of the Nissan. Lidey followed the 1999 OSP procedure for conducting photographic lineups. Each victim went to a separate room to view the photographic lineup and remained separated from the other victims after viewing the photographic lineup. Lidey informed the victims that they should not feel obligated to identify anyone in the photographic lineup as the driver. Additionally, Lidey read to each victim the OSP photographic lineup admonition, which provided, in part:

> "You should not conclude or guess that the photographs contain the picture of the person who committed the crime. You are not obliged to identify anyone. It is just as important to free innocent persons from suspicion as to identify guilty parties. Please do not discuss the case with other witnesses

appeared in his photo. Relevant features included age, height, weight, race, hair length, and facial hair.

[5] The foregoing description of the nonsuspects' features is based on witness testimony from the pretrial hearing and our own review of the photographic lineup.

nor indicate in any way that you have or have not identified someone."

Lidey noted how long it took each victim to identify the driver and asked each victim how strongly she felt about her choice. The victims were not aware that Lidey was timing their responses.

Wyland identified defendant in 10 seconds. In making the identification, Wyland stated that she had no question in her mind that she was picking the correct person, although she noted, "The girls got a lot better look at him than I did." Christensen identified defendant in two seconds and stated that she felt strongly about the identification. Similarly, Burns identified defendant in five seconds and also stated that she felt strongly about her choice.[6]

C.   *2010 pretrial hearing on defendant's motion in limine*

On May 11, 1999, defendant was charged with one count of public indecency in violation of ORS 163.465. Before trial, defendant filed a motion *in limine* to exclude evidence of the out-of-court and any in-court identifications of defendant.[7] Specifically, defendant argued that, under the *Classen* test, the photographic lineup was unduly suggestive because the nonsuspect photos portrayed persons with physical features distinct from defendant's appearance. According to defendant, any subsequent in-court identifications would be tainted by the out-of-court identification and, thus, would also be inadmissible. The state responded that the lineup was not suggestive and that, in any event, the trial court properly applied the *Classen* test, noting that each identification had a "source independent of" the pretrial identification procedure.

On October 22, 2010, the trial court conducted a hearing on defendant's motion and the state presented testimony from Wyland, along with Christensen and Burns,

---

[6] Because the state sought to introduce identification evidence relating to only Wyland, Christensen, and Burns, we do not recount the details of Payne's out-of-court identification. Payne did not testify at the pretrial hearing.

[7] Over 11 years elapsed from the date on which defendant was charged and the date of the pretrial hearing on defendant's motion *in limine*, which occurred on October 22, 2010. Defendant failed to appear at his plea hearing on October 27, 1999, and apparently did not return to Oregon until 2010.

who were then 24 and 23 years old, respectively. At the pretrial hearing, Wyland was unable to identify defendant in court. As to her out-of-court identification of defendant, she testified that defendant's photo was "different looking" from the other photos in the lineup. Christensen was also unable to make an in-court identification at the hearing, but she stated that defendant had the general "gist" of what she remembered of the driver's appearance. She explained that, during the incident, she got a clear look at defendant because "there was so much light in the car." With regard to the photographic lineup, Christensen testified that, when she identified defendant's photo, the driver's face was very "defined" in her memory. Only Burns was able to make an in-court identification, noting that she still had "the vision in [her] head." According to Burns, she had a clear view of the driver, who was looking at the girls with a "creepy smile." She further testified that she became nauseated and disgusted when she saw defendant's photo in the lineup.

The trial court denied defendant's motion, concluding that the identification process was not impermissibly suggestive under *Classen*. The trial court found that "[e]ach of the young girls had a clear view" of the driver and that the photographic lineup procedure was conducted soon enough "to prevent memory of the event from fading or becoming confused." As to the lineup photos, the trial court concluded that the photographic lineup was not suggestive, finding that "[t]he features of [the nonsuspects] approximated those of the defendant." Further, the trial court found that each victim gave a "consistent and complete" description of defendant and identified defendant "with a high degree of certainty" and "without any taint, collaboration or suggestion by other witnesses." The trial court noted that other evidence reinforced the out-of-court identification: the license plate number, the victims' description of the Nissan, and defendant's admission that he possessed the Nissan and drove on I-205 on the day of the incident. Moreover, the trial court considered it significant that the victims quickly identified defendant, because the fact that he had facial hair in his photo "should have made it more difficult to recognize him since he did not have a mustache at the time of the event."

The trial court issued a written order denying defendant's motion *in limine*. Defendant entered a conditional guilty plea to public indecency, reserving the right to appeal the denial of his motion. As noted, defendant appeals the judgment of conviction, assigning error to the denial of his motion *in limine*.

## II.  DISCUSSION

On appeal, defendant challenges the trial court's denial of his motion *in limine* under *Lawson / James*, raising individual arguments with respect to three parts of the eyewitness identification evidence: (1) the victims' out-of-court identifications made during the pretrial photographic lineup process in 1999; (2) any in-court identifications at a trial that would have occurred approximately 11 years after the incident; and (3) the victims' statements regarding their certainty in the accuracy of their out-of-court identifications of defendant.

We begin with a brief summary of the framework under *Lawson / James*, which governs the admission of eyewitness identification evidence. Under that framework, "when a criminal defendant files a pretrial motion to exclude eyewitness identification evidence, the state as the proponent of the eyewitness identification must establish all preliminary facts necessary to establish admissibility" under the generally applicable provisions of the Oregon Evidence Code. *Lawson / James*, 352 Or at 761. Where the pretrial challenge implicates OEC 602 or OEC 701, the state must provide "proof under OEC 602 that the proffered eyewitness has personal knowledge of the matters to which the witness will testify, and proof under OEC 701 that any identification is both rationally based on the witness's first-hand perceptions and helpful to the trier of fact." *Id.* at 762. If the state satisfies its burden, the burden shifts to the defendant to prove "under OEC 403 that, although the eyewitness evidence is otherwise admissible, the probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence." *Id.*

The court in *Lawson/James* identified two categories of factors known to affect the reliability and, thus, the probative value, of eyewitness identifications: estimator variables and system variables. Estimator variables refer to "characteristics of the witness, the alleged perpetrator, and the environmental conditions of the event that cannot be manipulated or adjusted by state actors."[8] *Id.* at 740. For example, in *Lawson*, a number of estimator variables undermined the reliability of the identification evidence. In that case, the eyewitness, who had sustained a critical gunshot wound, was under "tremendous stress and in poor physical and mental condition," which the court noted would "tend to impair a witness's ability to encode information into memory." *Id.* at 763. Further, the environmental conditions under which the eyewitness viewed the perpetrator were poor: it was dark and the perpetrator had covered the eyewitness's face with a pillow to obscure her view. The eyewitness viewed the perpetrator for only a few seconds, and the perpetrator wore a hat that concealed his hair, a key identifying feature. Finally, the eyewitness's in-court identification of the defendant occurred over two years after the incident. By contrast, the court was less concerned with the estimator variables in *James*, which involved a robbery in which the eyewitnesses were face-to-face with the perpetrators and observed them for a lengthy period of time. Additionally, the eyewitnesses described the perpetrators with detail, noting their "race, height, weight, and clothing." *Id.* at 765.

System variables, by contrast, relate to "circumstances surrounding the identification procedure itself that are generally within the control of those administering the procedure."[9] *Id.* at 740. In *Lawson*, a number of system

---

[8] Estimator variables include the witness's level of stress; the witness's attention; the duration of exposure; environmental viewing conditions; the witness's physical and mental characteristics; the witness's description of the perpetrator; the perpetrator's characteristics; the speed of the identification; the witness's confidence or certainty (which is not a reliable indicator of accuracy); and memory decay. *Id.* at 744-46.

[9] System variables include factors such as whether the identification procedure was conducted by a person who was unaware of the suspect's identity; whether preidentification instructions were given to reduce the likelihood of misidentification; the manner in which the photographic lineup was constructed and presented to the witness; whether multiple viewings of the suspect led to source

variables were at play. For instance, when the police first interviewed the eyewitness, she was hospitalized and in a "fragile physical and mental condition." *Id.* at 764. At that time, the police used leading questions and "implicitly communicated their belief that [the] defendant was the shooter." *Id.* Moreover, before identifying the defendant as the perpetrator, the eyewitness viewed the defendant in two photographic lineups, in a newspaper article photo, and at a hearing to which police had brought her. Finally, the court considered significant the alterations in the eyewitness's statements over time. She initially told police that she had not seen the perpetrator's face, but later identified the defendant as the perpetrator "[a]fter a series of leading questions" by the police. *Id.* at 765. Conversely, in *James*, the system variables did not require exclusion of the eyewitness identification evidence, despite the court's determination that the police conducted a suggestive showup. Central to that conclusion was the accuracy with which the eyewitnesses described the perpetrators' "unique features" before the suggestive showup. *Id.* at 767. Those unique features included the perpetrators' clothing and a particular bottle of beer found in the defendant's backpack.

Ultimately, "[t]he decision whether to admit, exclude, or fashion an appropriate intermediate remedy short of exclusion is committed to the sound exercise of the trial court's discretion." *Id.* at 762. In *Lawson/James*, the court noted that "it is doubtful that issues concerning one or more of the estimator variables that we have identified will, without more, be enough to support an inference of unreliability * * *." *Id.* However,

> "[i]f the state's administration of one or more of the system variables (either alone or combined with estimator variables) results in suggestive police procedures, that fact can, in turn, give rise to an inference of unreliability that is sufficient to undermine the perceived accuracy and truthfulness of an eyewitness identification—only then may a trial court exclude the eyewitness identification under OEC 403."

confusion; whether suggestive wording or leading questions by investigators contaminated the witness's memory; and whether post-identification confirming feedback falsely inflated the witness's confidence in the accuracy of his or her identification. *Id.* at 741-44.

*Id.* at 763. Thus, in those cases, the trial court assumes a "heightened role as an evidentiary gatekeeper because 'traditional' methods of testing reliability—like cross-examination—can be ineffective at discrediting unreliable or inaccurate eyewitness identification evidence." *Id.* at 758.

A. *Admissibility of the 1999 out-of-court identification evidence*

Defendant argues that, under *Lawson / James*, the trial court erred in concluding that the out-of-court identifications of defendant were admissible. In particular, he contends that, because the photographic lineup was composed such that defendant's photo obviously stood out from the group, the out-of-court identifications were the product of an unduly suggestive police procedure.

We analyze the admissibility of the 1999 out-of-court identifications under the framework set out in *Lawson / James*. First, we conclude that the personal knowledge requirement under OEC 602 is satisfied. The trial court found that Christensen and Burns had a clear view of the driver during the incident; thus, they had an opportunity to observe his features. Although, as defendant points out, some estimator variables could have negatively affected the accuracy of the victims' observations, others establish that the victims' observations were reliable. For example, although driving down I-205 while it was dark outside might have impeded the victims' view of the driver, the driver remained parallel with Wyland's car and looked right at the victims while the dome light illuminated the inside of the Nissan. Therefore, the environmental viewing conditions were not so poor as to obscure the victims' view of the driver. Moreover, although Christensen and Burns were only 12 years old at the time and were likely distracted by the driver's conduct, the trial court found that both girls gave "consistent and complete" descriptions of the driver. Defendant aptly notes that the trial court improperly considered the level of certainty with which each victim made her identification.[10] Notwithstanding that improper

---

[10] As noted in *Lawson / James*, an eyewitness's level of certainty is generally "a poor indicator of identification accuracy" and "has substantial potential to influence jurors." 352 Or at 745. "Retrospective self-reports of certainty are highly

consideration, however, no reasonable decisionmaker could have found that the victims lacked the personal knowledge necessary to identify the driver.

Next, we consider whether the victims' out-of-court identifications were derived from their initial untainted observations or from suggestive police procedure in composing the photographic lineup.[11] According to defendant, the physical features of the nonsuspects matched neither defendant's DMV photo nor the victims' initial description of the driver, whom they described as a Caucasian male in his early thirties with short, dark hair and a pale face. Although Wyland could not recall whether the driver had facial hair, the three 12-year-old girls stated that he did not. Defendant contrasts that description with the five nonsuspect photos, noting that those photos portray two heavy-set Caucasian males with long hair and no facial hair, one Caucasian male with long hair and a full beard, and two dark-complexioned males with distinct facial hair. As the proponent of the evidence under OEC 701, the state was required to prove that it was more likely that the victims' identifications were based on their original perceptions than on the allegedly suggestive photographic lineup.

The trial court found that the physical features of the nonsuspects approximated those of defendant and, hence, determined that the composition of the lineup was not unduly suggestive. We conclude that any differences between defendant and the nonsuspects as to facial hair, apparent skin tone, hair length, and apparent stature were not so distinguishing as to single out defendant. Facial hair was not a salient characteristic included in the victims' initial descriptions of the driver. In fact, the descriptions provided by Wyland and the 12-year-old girls varied as to whether the driver had facial hair: Wyland could not recall

---

susceptible to suggestive procedures and confirming feedback, a factor that further limits the utility of the certainty variable." *Id.*

[11] Defendant also asserts that the system variable of blind administration is at play in this case. Specifically, he relies on the statement in *Lawson / James* that all identification procedures should be conducted by a "blind" administrator (a person who is unaware of the suspect's identity). *Lawson / James*, 352 Or at 741. Because the record is devoid of, and defendant does not point to, any evidence that Lidey consciously or unconsciously suggested information regarding the driver's identity to the victims, we do not consider the system variable of blind administration.

whether the driver had facial hair and the girls stated that he did not. Further, as the trial court noted, the fact that defendant had facial hair in his DMV photo should have made it more difficult for the girls to identify defendant as the driver. As to apparent skin tone, any differences in complexion were not plainly obvious given that the photos were black-and-white. Although the driver's pale complexion was a distinguishing referent of the victims' descriptions, at least three of the five photos consisted of males with patently light complexions. Finally, with the exception of the fourth photo of the nonsuspect with notably long hair, any differences in hair length and stature were not so apparent as to orient the viewer toward defendant's photo.

Moreover, as in *James*, other facts support the conclusion that the victims' out-of-court identifications were based on their original observations. The trial court found that each victim gave a consistent and complete description of the driver, including his race, stature, and hair color, before the allegedly suggestive procedure occurred. Similarly, in *James*, the fact that the eyewitnesses provided a detailed description of the perpetrators before the suggestive showup increased the reliability of the identification evidence.

Further, the victims gave a detailed description of the Nissan—which was registered in defendant's name— noting that it had rear-end damage, a missing rear bumper, and a trunk held closed by bungee cords. Those details are analogous to the "unique features" included in the eyewitness' initial descriptions in *James*, where the eyewitnesses described the perpetrators' clothing and the specific bottle of beer found in the defendant's possession.

Additionally, the trial court found that each victim identified defendant without any taint, collaboration, or suggestion by other victims. No evidence in the record indicates that Lidey engaged in suggestive questioning. Pursuant to OSP policy, Lidey informed the victims that they need not make an identification and that the driver's photo might not be included in the group of photos. Nonetheless, it took each victim no more than 10 seconds to identify defendant as the driver. This case, hence, stands in stark contrast to *Lawson*, where the police employed

leading questions and facilitated viewings of the defendant, all of which occurred before the eyewitness identified the defendant as the perpetrator.

Finally, defendant admitted to driving on I-205 on the day of the incident and told Swift, "Of course she'll recognize me. I was there." In short, the victims' consistent descriptions of the driver, the OSP procedures utilized to mitigate suggestiveness, and defendant's inculpating statements all indicate the reliability of the victims' observations. Thus, the trial court did not err in concluding that the victims' identifications were based on their original observations.

We next consider whether the out-of-court identifications were helpful to the trier of fact, as required by OEC 701, and whether, under OEC 403, the probative value of those identifications was substantially outweighed by the unfair prejudice introduced by that evidence. In light of defendant's own inculpating statements and the fact that the victims' descriptions of the driver and the car so closely matched defendant and his Nissan, we think that the subsequent out-of-court identifications of defendant prejudiced him little. We conclude that the trial court did not err in ruling that the victims' 1999 out-of-court identifications were admissible.

B. *Admissibility of in-court identification evidence*

Defendant next contends that the trial court erred in determining that any in-court identifications would be admissible at trial, because the state failed to satisfy its burden under OEC 701. Specifically, defendant stresses that, because the trial would have occurred 11 years after the incident, any in-court identification would be tainted by the estimator variable of memory decay and, therefore, would not be rationally based on the victims' original observations of the driver.

Although the 11-year gap is troublesome, the trial court reasonably could have concluded that it was more likely that any in-court identification would be based on the victims' own perceptions than on memory decay. Despite the trial court's improper consideration of the victims' certainty

in making the out-of-court identifications, the trial court carefully considered and expressly relied on other facts that supported its conclusion. As discussed above, the trial court found that the young girls had a clear view of the driver at the time of the incident and that the victims gave consistent and complete descriptions of the driver. The trial court also found that the victims' description of the Nissan and defendant's admissions corroborated the victims' first-hand observations. Based on the foregoing, we conclude that there is evidence sufficient to support the conclusion that any in-court identification would be rationally based on the victim's first-hand perceptions.

The next issues under *Lawson / James* are whether the in-court identifications would have been helpful to the trier of fact and whether OEC 403 required their exclusion. On both points, we must consider whether any in-court identifications at a trial occurring approximately 11 years after the incident would be any more helpful to the jury than the victims' detailed descriptions of the driver and out-of-court identifications of defendant, and, correspondingly, whether the probative value would be outweighed by the unfair prejudice resulting from the in-court identifications. We think that the concerns of unfair prejudice are negligible. The record does not reflect whether the state would have sought to introduce any in-court identification evidence at trial. At the pretrial hearing, neither Wyland nor Christensen were able to identify defendant as the driver. Accordingly, any in-court identification by Wyland or Christensen would not have aided the prosecution. Only Burns was able to make an in-court identification. Although the estimator variable of memory decay could have negatively affected Burns's original observations of the driver, defendant would have had the opportunity, through cross-examination, to probe the reliability of her in-court identification. We conclude that the trial court did not err in reaching its conclusion that the in-court identifications would be permissible at trial.

C. *Admissibility of victims' self-appraisals of their certainty*

Finally, defendant argues that, even if the trial court properly determined that the eyewitness identification evidence was admissible, it nevertheless erred in failing to

exclude evidence of the victims' statements concerning their level of certainty, which they made after identifying defendant in the photographic lineup. We disagree.

Although it is true that an eyewitness's self-appraisal of her certainty is not a good indicator of identification accuracy, *see Lawson/James*, 352 Or at 745 (so stating), defendant did not argue to the trial court that the self-appraisals were particularly unreliable. In his motion *in limine* and at the pretrial hearing, defendant sought to exclude the out-of-court identification evidence as a whole, rather than raising specific arguments regarding the admissibility of the different forms of that evidence. When a party objects to evidence as a whole and the trial court rules that the evidence is admissible, the reviewing court will affirm the trial court's ruling when any part of the evidence is admissible. *See Sarich*, 352 Or at 618 ("It has long been the rule in this state that, when a party offers evidence as a whole and the evidence is rejected by the trial court, the appellate court will affirm the trial court's ruling if any part of the evidence is inadmissible." (Citation omitted.)). Accordingly, we conclude that the trial court did not err in admitting the victims' out-of-court identifications.

### III.   CONCLUSION

We conclude that application of the revised test under *Lawson/James* could not have resulted in exclusion of the out-of-court or in-court eyewitness identification evidence. Because we conclude that the trial court did not err in determining that that evidence was admissible, and because defendant did not raise specific arguments regarding the admissibility of the victims' self-appraisals of their certainty, we affirm the trial court's order denying defendant's motion *in limine*.

Affirmed.