Argued and submitted November 29, 2012, in A144180, reversed and remanded; in A144179, affirmed January 30, 2013

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MICHAEL WAYNE WESLEY, JR.,
*Defendant-Appellant.*

Lane County Circuit Court
200823316, 200820014;
A144180 (Control), A144179

295 P3d 1147

Ryan T. O'Connor, Senior Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Janet A. Klapstein, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Anna M. Joyce, Solicitor General.

Before Armstrong, Presiding Judge, and Sercombe, Judge, and Brewer, Judge pro tempore.

BREWER, J. pro tempore.

### BREWER, J. pro tempore

Defendant was convicted of multiple offenses in two consolidated cases. In the first case, which involved events that occurred on September 3, 2009, defendant was convicted of murder, attempted murder, unlawful use of a weapon, felon in possession of a firearm, and unlawful use of a vehicle. In the second case, which involved events that occurred on September 4, 2009, defendant was convicted of second-degree assault, assaulting a public safety officer, and second-degree criminal mischief. Defendant raises three issues on appeal, all of which concern the murder, on September 3, 2009, of WJW and the surrounding events. First, he asserts that the trial court should have granted his motion for judgment of acquittal on the murder count, on the ground that the doctrine of "transferred intent" is not codified in Oregon law. Second, he argues that an eyewitness's identification of him at the scene of the murder should not have been admitted into evidence because it was the product of suggestive police procedure and was not otherwise shown to be reliable. Third, defendant makes an unpreserved argument that the trial court erred in instructing the jury on the "natural and probable consequences" of an accomplice's actions. We reject that argument without discussion because defendant failed to preserve it, as required by ORCP 59 H. *See State v. Alonzo*, 249 Or App 149, 274 P3d 889, *rev den*, 352 Or 377 (2012).

With respect to the issue of transferred intent, as explained below, we conclude that the trial court correctly determined that the transferred intent doctrine for the crime of murder still exists in Oregon law. As for defendant's eyewitness identification challenge, as explained below, we conclude that his convictions in the September 3 case must be reversed and remanded with instructions to the trial court to conduct a new hearing on that issue in light of the Oregon Supreme Court's recent decision in *State v. Lawson / James*, 352 Or 724, 291 P3d 673 (2012).

Because defendant was convicted after a jury trial, we set out the facts in the light most favorable to the state. *State v. Johnson*, 342 Or 596, 598, 157 P3d 198 (2007), *cert den*, 552 US 1113 (2008). In the early morning hours of

September 3, defendant and Smith went to WJW's house, looking for WJW's boyfriend, Anderson. They entered the garage and turned off the power to the house, then left and stole a car, intending to return. Meanwhile, WJW and Anderson discovered that the garage had been entered and the power had been turned off. WJW left the house in her car, and Anderson left on foot. Defendant and Smith saw WJW's car leaving and followed it. WJW pulled over to pick up Anderson, and, as she did so, defendant and Smith both shot at Anderson from the car that they had stolen. Anderson ducked behind the far side of WJW's car, and then shot back at defendant and Smith with a flare gun. One of the bullets from Smith's gun, a .45, struck and killed WJW. Defendant's shot from a shotgun hit a nearby house. Anderson was not injured.

Detective Turner arrived at the scene shortly thereafter. Anderson gave him a false name and birth date. Turner asked if Anderson knew who the shooter was, and Anderson indicated that the car had been driven by someone named "Ronnie" whose last name he did not know. Anderson was not able to give any description of "Ronnie," and he was unsure whether there had been more than one person in the car. Anderson initially indicated that he believed that WJW had been shot because someone had tried to pick her up in a bar the previous evening.

Anderson was taken to the police station where he was interviewed by Detective Boring several hours after the shooting. Anderson told Boring that he could not identify anyone who had been in the car and that "he had no idea who was in that vehicle." Anderson gave Boring information indicating that, several days earlier, Anderson had been involved in a drug deal that had gone bad and that, among other people, Morris and Smith also had been involved. Boring located Morris, who identified Smith. Anderson was shown a picture of Smith, and he identified Smith as having been involved in the drug deal. Smith was arrested later that day and implicated himself and defendant in the shooting of WJW. Defendant was then arrested as well.[1]

---

[1] The September 4 offenses were committed when police apprehended defendant. Because those convictions are not at issue on appeal, we do not describe them.

After defendant's arrest, Boring showed Anderson a photograph of defendant and asked if he knew the person in the photograph. Anderson stated that he "did not know who it was and had never seen him before." When Anderson was shown the photograph of defendant, he knew that the depicted person had been apprehended as a suspect in WJW's murder. At no time did Anderson provide the police with any physical description of anyone who had been in the car during the shooting.

Approximately five months later, Anderson spoke with WJW's father, who told Anderson that Smith had confessed and indicated that there were two people in the car. WJW's father told Anderson that the police had said that Anderson could not identify the people in the car. Anderson told WJW's father that that was not the case and that he had identified defendant when the police had showed him defendant's photograph. WJW's father told Anderson "to talk to the district attorney or talk to the police and tell them that you could identify [defendant]." Detective Myers followed up with Anderson, who indicated that he had recognized both Smith and defendant from the photos that Boring had showed him. Anderson told Myers that Boring had been mistaken in reporting that Anderson was not able to identify the shooters.

Anderson testified at a pretrial hearing concerning the admissibility of his identification of defendant that he had lied to the police in his initial interviews and that he had, in fact, recognized defendant as one of the shooters when he was shown defendant's photograph. He indicated that he had not wanted to cooperate with the police because he wanted to retaliate against defendant himself. Anderson indicated that he was able to see Smith driving the car, that he recognized Smith from the earlier drug deal, and that he also saw defendant in the car. Evidence was also adduced at the pretrial hearing that Smith—who had confessed to the crimes—had stated that he was the passenger in the car and that defendant was the driver, although before he had accepted a plea bargain, Smith had stated that he—Smith—was the driver.

The trial court ruled that Anderson would be permitted to testify as to his identification of defendant:

"The police did not follow their normal procedure in showing witness [Anderson] a single photo of the defendant; that process unfairly singled out the defendant as was suggestive. However, at the time of that showing, [Anderson] did <u>not</u> identify the defendant as one of the occupants of the drive-by vehicle. Mr. Anderson testified he had an opportunity to get a good look at those occupants; he was watching the vehicle closely as it approached and passed by quite closely; it was morning and well lit at the time. Anderson testified he kept the other car in sight because he was fearful it might stop and the occupants get out. Anderson's <u>testimony</u> itself was inconsistent with, and in some regards contradicted, his earlier statements to police. He was, however, certain in his testimony and certain of what he saw at the time of the shooting. Anderson's prior inconsistent statements go to the weight of his identification testimony rather than its admissibility."

(Underscoring in original.)

The case proceeded to trial and, as pertinent here, the state's theory of defendant's culpability for WJW's murder was that he had aided and abetted Smith, who, although intending to kill Anderson, killed WJW and thus was liable for her murder based on the theory of "transferred intent." Smith entered into a plea bargain with the state, agreeing to plead guilty to WJW's murder and testify against defendant at trial.

When initially questioned by the police, Smith had denied involvement in the shooting. However, he later told the police various stories about his involvement, indicating that he had been present but that two other people had done the shooting. Eventually, he stated that he had been the driver of the car and that defendant, armed with the .45, had shot WJW from the passenger seat. However, Smith testified at defendant's trial that, contrary to his earlier story, in fact, defendant had been driving the vehicle while wielding the shotgun and that Smith had fired the .45 from the passenger seat and killed WJW. Anderson testified, consistently with his testimony at the pretrial hearing, that defendant had been the passenger and Smith had been driving the car.

Defendant, for his part, presented an alibi defense at his trial. He adduced evidence that, although he was with Smith shortly before and shortly after the shooting, he was with another friend at the time of the shooting.

As noted, defendant was found guilty by a jury, and the present appeal ensued. We first address defendant's argument that the trial court should have granted his motion for judgment of acquittal on the ground that the doctrine of transferred intent is inapplicable to murder under Oregon law.[2]

The common-law doctrine of transferred intent is a bedrock principle of English common law: "[I]f one shoots at A and misses him, but kills B, this is murder; because of the previous felonious intent, which the law transfers from one to the other." William Blackstone, 4 *Commentaries on the Laws of England* 201 (1769). The doctrine has been described more colloquially in some American jurisdictions as "the intention follows the bullet." *Gladden v. State*, 273 Md 383, 397, 330 A2d 176 (1974) (citing cases). Although not codified, the doctrine historically has been an integral part of Oregon law as well:

> "The assassin who lies in wait, harboring in his bosom a murderous design to slay a human being, cannot extenuate his offense because he did not kill the particular person he designed to. All the circumstances constituting murder in the first degree are present, and if he is guilty at all he is guilty of that crime, and there is no more reason for lessening the degree of the crime in consequence of that circumstance than there would be in acquitting him out and out."

*State v. Murray*, 11 Or 413, 420, 5 P 55 (1884); *see also State v. Grayson*, 126 Or 560, 568, 270 P 404 (1928) ("[I]f, in attempting to shoot Albert Grayson or Sullivan, the shot went wild and killed Myrtle Grayson, the defendant would, if the other elements of the crime as they related to the two men were present, be just as guilty as if he had intended to shoot the woman."); *State v. Johnson*, 7 Or 210, 211 (1879)

---

[2] Defendant makes essentially the same legal argument in the context of challenging a jury instruction on transferred intent. Because a judgment of acquittal would afford him more complete relief, we address his single legal argument in the context of his motion for judgment of acquittal.

("It is equally well settled that if one person intending to kill another shoots at him, and missing his aim kills a third, he is as guilty as if he had killed the one at whom the shot was fired. This is an elementary principle of criminal law.").

Although acknowledging that transferred intent in murder cases has historically been embodied in Oregon law, defendant asserts that, when the legislature adopted a new Criminal Code in 1971, it abandoned the common-law doctrine of transferred intent. Defendant observes that the doctrine had applied to "first-degree" murder, which required proof of premeditation and malice. The 1971 Criminal Code, however, abandoned the concepts of malice and premeditation with respect to homicide, as well as the distinctions between first-degree and second-degree murder, and replaced them with the following enactment:

"(1)  A person commits criminal homicide if, without justification or excuse, he intentionally, knowingly, recklessly or with criminal negligence causes the death of another human being.

"(2)  'Criminal homicide' is murder, manslaughter or criminally negligent homicide."

ORS 163.005 (1971). The legislative commentary to the statute indicates that "[n]o similar provision appears in the Oregon Revised Statutes but the definitions set out in this section are largely in line with the intent and operation of present provisions in Oregon Law." Commentary to the Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report § 87 (July 1970).

ORS 163.115 (1971) defined murder, in pertinent part, as follows:

"(1)  Except as provided in ORS 163.125 [manslaughter], criminal homicide constitutes murder when:

"(a)  It is committed intentionally; or

"(b)  It is committed recklessly under circumstances manifesting extreme indifference to the value of human life; or

"(c)  It is committed by a person, acting either alone or with one or more persons, who commits or attempts to commit arson in the first degree, burglary in the first degree,

escape in the first degree, kidnapping in the first degree, rape in the first degree, robbery in any degree or sodomy in the first degree and in the course of and in furtherance of the crime he is committing or attempting to commit, or the immediate flight therefrom, he, or another participant if there be any, causes the death of a person other than one of the participants."

Subsections (2) and (3) provided various defenses, and subsection (4) provided that "[a] person convicted of murder shall be punished by imprisonment for life." The commentary to that section indicates that the legislature believed that, in light of the state's abolition of the death penalty, the distinction between first-degree murder and second-degree murder was no longer needed. The commentary noted that first-degree murder

"had included three branches: any killing done 'purposely and of deliberate and premeditated malice' ***; a killing arising in the course of committing rape, arson, robbery or burglary (the felony-murder doctrine) ***; the third branch is a killing of a police officer without justification when the officer is acting in the line of duty."

Commentary at § 88. Second-degree murder had included

"four categories: the first category is anyone killing 'purposely and maliciously but without deliberation'; the second category is a killing arising out of 'any felony other than rape, arson, robbery or burglary'; the third branch of second degree murder is killing by an act 'imminently dangerous to others, and evincing a depraved mind, regardless of human life, although without any design to effect the death of any particular individual'; the fourth category is a killing as the result of a duel."

*Id.* The commentary further suggested that, although the concepts embodied in first-degree murder were reflected in the newly revised statute, certain concepts embodied in second-degree murder would qualify as murder under the "extreme indifference" standard, whereas others that had fallen in the "without deliberation" category of second-degree murder would be treated as manslaughter under the new scheme. *Id.* As noted, under the prior scheme, certain "felony murders" had been classified as first-degree murder—that is, when the underlying felony was rape, arson, robbery or

burglary—or classified as second-degree murder, when the underlying felony was any other felony. The commentary clarified that the legislature intended to make significant changes in the felony-murder doctrine, following the trend to abolish the doctrine insofar as it applied to any felony, but specifically retain the doctrine as it applied to the serious felonies specified in ORS 161.115(1)(c) of the revised Criminal Code: arson, burglary, escape, kidnapping, rape, sodomy, and robbery. *Id.*

At the same time, the legislature defined the four mental states of intentionally, knowingly, recklessly, and criminally negligent in ORS 161.085(7) to (10). ORS 161.085(7) provided—and continues to provide—the following definition:

> "'Intentionally' or 'with intent,' when used with respect to a result or to conduct described by a statute defining an offense, means that a person acts with a conscious objective to cause the result or to engage in the conduct so described."

Defendant reasons that, in light of the above-quoted statutes and commentary, the 1971 legislature abolished the doctrine of transferred intent with respect to murder. In addition to the fact that the legislature eliminated the concept of "malice," which had been part of the formulation of first-degree murder and, necessarily, part of the formulation of first-degree murder based on transferred intent, defendant argues that transferred intent is irreconcilable with the new statutory definition of "intentionally," because attempting to kill one person but, instead, killing another involves neither a "conscious objective to cause the result," ORS 161.085(7), nor a conscious objective "to engage in the conduct so described."

The state responds by noting that neither the statutory scheme enacted in 1971 nor the legislative commentary to that scheme specifically mentions the doctrine of transferred intent, and that the commentary is explicit about other ways in which the new statutory scheme was intended to change the law of murder. Thus, the state posits, the judicially created doctrine of transferred intent remained a part of the law of murder in Oregon despite those statutory changes.

The question before us is not a simple one. Oregon's Criminal Code does not specifically address (and never has specifically addressed) the applicability of the common-law doctrine of transferred intent, although the Oregon Supreme Court has described it as "an elementary principle of criminal law" and regularly applied it. *Johnson*, 7 Or at 211. On the other hand, in enacting the 1971 code, the legislature *did* specifically address—and modify—the felony-murder rule, which is, conceptually, a very closely related doctrine.

We believe, however, that the context of the 1971 Criminal Code strongly supports the conclusion that the legislature intended that the "elementary principle" of transferred intent continue to apply to murder prosecutions. We reach that conclusion based on two considerations: The stated scope of the felony-murder rule under the 1971 Criminal Code, as described above, and the constitutional edict that "all penalties shall be proportioned to the offense." Or Const, Art I, §16.

A simple hypothetical demonstrates why we must conclude that the Oregon Criminal Code embodies the transferred intent doctrine for murder: Assuming that, when defendant and Smith drove by Anderson and WJW and fired the shot that killed WJW, their intent was not to *kill* anyone but instead to *rob* Anderson, would defendant and Smith have committed the crime of murder? The answer clearly is "yes;" they would be liable for the murder of WJW under the felony-murder rule, as codified in the 1971 Criminal Code at ORS 163.115(1)(c) (1971), and in the current Criminal Code at ORS 163.115(1)(b)(G) (1971), because they committed a criminal homicide "in the course of and in furtherance of" a robbery.

All of the felonies listed in ORS 163.115(1)(c) (1971) on which a felony-murder conviction could be based were classified as Class A or Class B felonies. Those underlying felonies were punishable by maximum indeterminate sentences of 20 years (Class A) or 10 years (Class B). ORS 161.605(1), (2) (1971). By contrast, however, "[a] person convicted of murder shall be punished by imprisonment for life." ORS 163.115(4) (1971). It is inconceivable that the legislature would conclude that a person who commits

homicide while intending to commit one of the listed Class A or B felonies punishable by maximum sentences of 10 or 20 years should be liable for murder, whereas a person who commits homicide while intending to commit a *murder*, albeit of a different individual—which, if completed, would be subject to a harsher sentence—should be acquitted of murder. Put another way, would the legislature have intended that a person who intends to kill one person but kills another be acquitted of murder, while a person who intends to rob a person but in the course of doing so kills another be convicted of murder? We think not, particularly in light of the maxim "when one plausible construction of a statute is constitutional and another plausible construction of a statute is unconstitutional, courts will assume that the legislature intended the constitutional meaning." *State v. Kitzman*, 323 Or 589, 602, 920 P2d 134 (1996). Were we to conclude that killing someone in the course of attempting murder is not murder, but killing someone in the course of attempting or committing robbery or various other lesser offenses *is* murder, that conclusion would run afoul of the Oregon Supreme Court's jurisprudence concerning Article I, section 16, of the Oregon Constitution, which requires that penalties be proportioned to the offense.

*Cannon v. Gladden*, 203 Or 629, 281 P2d 233 (1955), is exemplary. There, the defendant was convicted of assault with intent to commit rape, which was punishable, at that time, by a sentence of life imprisonment. *Id.* at 630-31. The completed crime of rape, however, carried a maximum sentence of 20 years. *Id.* at 630. The court stated:

> "How can it be said that life imprisonment for an assault with intent to commit rape is proportioned to the offense when the greater crime of rape authorizes a sentence of not more than 20 years? It is unthinkable, and shocking to the moral sense of all reasonable men as to what is right and proper, that in this enlightened age jurisprudence would countenance a situation where an offender, either on a plea or verdict of guilty to the charge of rape, could be sentenced to the penitentiary for a period of not more than 20 years, whereas if he were found guilty of the lesser offense of assault with intent to commit rape he could spend the rest of his days in the bastille."

*Id.* at 632; *see also State v. Rodriguez/Buck*, 347 Or 46, 64-65, 217 P3d 659 (2009) (noting that, although *Cannon* involved application of the disproportionality principle in a circumstance involving a greater punishment for a lesser-included offense, disproportionality review is not limited to lesser-included crimes, but may involve considerations of "the offense and the penalty at issue in the context of related offenses and penalties").

In sum, were defendant correct that killing a person in the course of killing or attempting to kill another person is not murder, but killing a person in the course of committing various other felonies that are less "serious" than murder (in that they carry lesser penalties) is murder, that would create a proportionality problem of constitutional magnitude. Where neither the text of any statute in the Criminal Code, nor the commentary to the 1971 Criminal Code, suggests that the legislature intended to abolish the "elementary principle of criminal law" embodied in the doctrine of transferred intent, *Johnson*, 7 Or at 211, we will not assume that the legislature intended to produce such an anomalous, and constitutionally problematic, result. Therefore, we conclude that the trial court correctly denied defendant's motion for judgment of acquittal.

We now turn to defendant's remaining argument. He asserts that the trial court erred in denying his pretrial motion to exclude from evidence Anderson's identification of him as one of the participants in WJW's murder. In particular, defendant argued that, under the test set out in *State v. Classen*, 285 Or 221, 590 P2d 1198 (1979), the identification was the product of an unduly suggestive police procedure, and that the state had not established that the identification had "a source independent of the suggestive confrontation or photographic display, or that other aspects of the identification at the time it was made substantially exclude the risk that it resulted from the suggestive procedure." *Id.* at 232. The state responded that the trial court properly applied the *Classen* test, noting that Anderson continued to deny being able to identify the shooter until long after the suggestive identification procedure had occurred and arguing that the central issue with respect to the identification was Anderson's credibility, not his ability

to actually perceive who was committing the crime.[3] Both parties' arguments are reasonable, but it is unnecessary for this court to consider whether the trial court correctly applied the test from *Classen* because, after the briefing in this case was completed, the Oregon Supreme Court decided *Lawson/James*, in which it substantially revised the *Classen* test. The question before us, then, is whether the trial court's determination that Anderson's identification of defendant should be admitted into evidence was reversible error. *See State v. Jury*, 185 Or App 132, 137, 57 P3d 970, *rev den*, 335 Or 504 (2002) (appellate court generally applies law "existing at the time the appeal is decided"). As explained below, we conclude that, in light of the evidence, the admission of the challenged testimony is problematic under *Lawson/James*, and the September 3 case must be remanded for the trial court to reconsider the issue in light of the test set out in *Lawson/James*.

We begin with a brief summary of *Classen*, which set out a two-part test. The first part required a determination of whether the challenged identification had been made after an identification procedure that "was suggestive or needlessly departed from procedures prescribed to avoid such suggestiveness." 285 Or at 232. The second part required a determination of whether, despite the suggestive procedures, "other aspects of the identification at the time it was made substantially exclude the risk that it resulted from the suggestive procedure." *Id.* In making the latter determination, courts were to consider (1) "the opportunity that the witness had at the time to get a clear view of the persons involved in the crime," (2) the attention that the witness "gave to their identifying features," (3) "the timing and completeness of the description given by the witness after the event," (4) "the certainty expressed by the witness," and (5) "the lapse of time between the original observation and the subsequent identification." *Id.* at 232-33. Here, the trial court applied *Classen*, concluding that the identification procedure had been suggestive, but that Anderson "had an opportunity to get a good look at [the occupants of the drive-by vehicle]," and that the vehicle "passed by quite closely;

---

[3] The state also argues that defendant did not sufficiently preserve the issue. We reject the state's argument in that respect without discussion.

it was morning and well lit at the time." The court did note that Anderson's testimony was inconsistent with his earlier statements to the police, but it concluded that that went "to the weight of his identification testimony rather than its admissibility."

In *Lawson / James*, the court held that the threshold inquiry from *Classen*—whether there had been suggestive police procedures—was unnecessary as a preliminary and independent inquiry: "There is no reason to hinder the analysis of eyewitness reliability with purposeless distinctions between suggestiveness and other sources of unreliability." 352 Or at 747. The court also concluded that the factors listed in the second part of the *Classen* test were flawed, primarily because they "rely heavily on the eyewitnesses' self-reports to establish the existence or nonexistence of suggestibility factors." *Id.* at 748. In particular, the court stated that suggestive identification procedures, suggestive questioning, and suggestive feedback all can "falsely inflate witness confidence" and thus contribute to increasing the appearance of reliability without increasing reliability itself. *Id.* at 744. In short, the court concluded that several of the factors in the second prong of the *Classen* test, in particular the factors concerning witness certainty and the witness's own reports may not, in fact, be independent of the suggestive identification procedure, at least insofar as those reports are made after the suggestive procedure has occurred.

In place of the *Classen* factors, the court in *Lawson / James* identified two sets of applicable considerations in evaluating the reliability of eyewitness testimony: system variables and estimator variables. System variables concern the manner in which the identification is made and include factors such as whether the identification procedure was conducted "blind," by a person who did not know the identity of the suspect and, thus, could not consciously or unconsciously suggest that information to the witness, how the witness was instructed; how the line-up or photo throwdown was constructed (with preference to sequential rather than simultaneous showings); whether multiple viewings could have led the witness to become familiar with the

suspect's face; whether suggestive or leading questions or comments by investigators or others may have contaminated the witness's memory; and whether confirming feedback after an identification was made boosted the confidence of the eyewitness. *Lawson / James*, 352 Or at 741-44. Estimator variables, on the other hand, involve the witness's stress level at the time of the observation, the witness's attention, the duration of the exposure, the environmental viewing conditions, the witness's characteristics and conditions, the witness's description, the perpetrator's characteristics, the speed of identification, the level of certainty (generally not seen as a good indicator of reliability), and memory decay over time. *Id.* at 744-46.

As the court explained in *Lawson / James*, a trial court is to consider these factors with reference to OEC 602 ("witness has personal knowledge"), OEC 701 (witness may communicate what witness has perceived, such as "the identity of a person"), and OEC 403 (evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion or misleading of the jury, undue delay or needless presentation of cumulative evidence). 325 Or at 752-58. In particular, it is in the process of balancing under OEC 403 that the court must consider the system and estimator variables that may affect eyewitness testimony:

> "The more factors—the presence of system variables alone or in combination with estimator variables—that weigh against reliability of the identification, the less persuasive the identification evidence will be to prove the fact of identification, and correspondingly, the less probative value the identification will have."

352 Or at 757.

The court concluded:

> "As a discrete evidentiary class, eyewitness identifications subjected to suggestive police procedures are particularly susceptible to concerns of unfair prejudice. Consequently, in cases in which an eyewitness has been exposed to suggestive police procedures, trial courts have a heightened role as an evidentiary gatekeeper because 'traditional' methods of testing reliability—like cross-

examination—can be ineffective in discrediting unreliable or inaccurate eyewitness identification evidence."

*Id.* (footnote omitted). The court further emphasized that "[t]he decision whether to admit, exclude, or fashion an appropriate intermediate remedy short of exclusion is committed to the sound exercise of the trial court's discretion." *Id.* at 762. Finally, the court emphasized that it did not anticipate that many eyewitness identifications would be excluded from evidence based solely on "estimator variables." Rather, the court explained, the pretrial procedure for excluding eyewitness testimony would most often be used in situations in which system variables result in suggestive police procedures, which can "give rise to an inference of unreliability[.]" *Id.* at 763.

The court then turned to the specific facts of the *Lawson* case and the *James* case, concluding in *Lawson* that, in light of the facts, and

"[d]ue to the novelty and complexity of the procedures we have articulated today, the parties must be permitted on retrial to (1) supplement the record with any additional evidence that may bear on the reliability of the eyewitness identifications at issue here, and (2) present arguments regarding the appropriate application of the new procedures set out in this opinion."

*Id.* at 765. By contrast, in *James*, the court concluded, based on the facts of that case, that "application of the revised test that we have established here could not have resulted in the exclusion of the eyewitness identification evidence." *Id.*

Although an extensive comparison of the facts in *Lawson*, *James*, and the present case is unnecessary, we highlight some of the court's considerations present in *Lawson* (or absent in *James*) that we believe support our conclusion that this case, like *Lawson*, must be remanded to permit the parties to supplement the record and make additional arguments with respect to the new factors that the Supreme Court has prescribed.

Turning to the estimator variables, in *Lawson*, the court noted a number of estimator variables that raised concerns about the reliability of the eyewitness's

identification. First, the eyewitness, having sustained a critical gunshot wound to the chest, was experiencing a high level of "stress and fear," as well as the effects of her injury, which the court concluded would "tend to impair a witness's ability to encode information into memory." 352 Or at 763. Next, the lighting conditions were poor, and a pillow partially obscured her view of the perpetrator. *Id.* Her view of the perpetrator was brief, and her in-court identification of the defendant occurred over two years after the crime. *Id.* at 763-64. In contrast, the estimator variables in *James*, which concerned a theft in a supermarket, raised fewer concerns. Before the suggestive police procedures occurred in that case, the witnesses had, immediately after the crime, provided the police with detailed descriptions of the perpetrators "that included the race, height, weight, and clothing of both perpetrators." *Id.* at 765. The court also noted that the witnesses had been "face to face with the perpetrators and had clear opportunities to observe their features" for a lengthy period of time. *Id.* at 766.

In the present case, the estimator variables raise more concern than those at issue in *James*, although perhaps less than those in *Lawson*. First, with respect to the eyewitness's stress level, it is undisputed that the perpetrators were shooting at the eyewitness, that the eyewitness knew it, and that the eyewitness ducked behind the victim's vehicle in order to avoid being shot. The duration of exposure was brief, because this was a drive-by shooting. There was evidence that the eyewitness had used methamphetamine the night before the shooting, although no evidence was presented as to what effect that might have had on his ability to perceive. And, notably, there was no evidence that the eyewitness had provided any description at all of the perpetrators' characteristics before the suggestive procedure occurred—in fact, like the eyewitness in *Lawson*, he maintained during his early police interviews that he was unable to identify any perpetrator. Finally, although not an estimator variable that is specifically enunciated in *Lawson/James*, we note that Anderson's eyewitness account was significantly different from the only other eyewitness account, that of Smith, in one important respect: Smith testified that he had been a passenger and

that defendant had been driving the car when the shooting occurred, whereas Anderson testified that defendant had been in the passenger seat and Smith had been driving the car. That is, the only information that Anderson provided in describing the perpetrators was contradicted by the only other evidence on that point. *See Lawson/James*, 352 Or at 767 (details provided by eyewitnesses, including items stolen by perpetrators, as well as clothing and physical details were confirmed by other evidence).

With respect to system variables, in *Lawson*, the court was concerned that (1) the police used leading and suggestive questioning when first interviewing the eyewitness, who was in a "fragile mental and physical condition," and implanted the idea that the perpetrator was the person (the defendant) whom she had seen earlier that day, 352 Or at 764; (2) after the witness was unable to identify the perpetrator on at least two occasions, police brought her to a preliminary hearing to view the defendant and exposed her to pictures of the defendant, *id.*; and (3) the alterations in the eyewitness's statements over time were "indicative of a memory altered by suggestion and confirming feedback." *Id.* at 765. In *James*, by contrast, although there had been a suggestive show-up, the accuracy of the eyewitness's descriptions of the perpetrators *before* the suggestive show-up, which included "unique features," "clothing that defendant and his companion were wearing (one item of which was unusual for that location at that time of year) and a specific bottle of beer that was found in defendant's possession," supported the trial court's conclusion that the witnesses' identifications were based on their original observations. *Id.* at 767. This case is like *James* in that there was only one suggestive police procedure—specifically, Anderson was shown a single picture of defendant, whom he knew to be a person who had been arrested for WJW's murder, and he was asked if he recognized defendant—instead of many. It is, however, like *Lawson* in that, well before Anderson identified defendant, he had been subjected to the suggestive procedure and leading questions. Moreover, as in *Lawson*, there were significant alterations in his story over time, which may

indicate "a memory altered by suggestion and confirming feedback."[4]

In sum, the identification in this case is problematic under *Lawson / James* for several reasons, including, most notably, that the eyewitness maintained before the suggestive procedure that he was unable to identify the perpetrators, the eyewitness provided no description at all of the perpetrators before the suggestive procedures, and the eyewitness's opportunity to view the perpetrators was relatively brief and occurred while he was attempting to avoid being shot. In light of those concerns, we conclude that a new hearing on the admissibility of the challenged eyewitness identification is required, based on the considerations prescribed in *Lawson / James*.

In A144180, reversed and remanded; in A144179, affirmed.

---

[4] The state asserts that the evidence here merely demonstrated that Anderson falsely told police on earlier occasions that he could not identify the perpetrators, that whether or not a witness is lying is something that can be addressed through cross-examination and through impeachment of the witness, and ultimately must be decided by a jury. We disagree with the state's premise that evidence that an eyewitness has told inconsistent stories about identification of perpetrators somehow does not decrease the reliability of that witness's in-court identification, depending on what that witness says about why he or she has told inconsistent stories. Although evidence that an eyewitness is lying rather than accurately or inaccurately recalling something may well ultimately affect how the jury views that evidence, it does not provide a basis for concluding that the evidence in question should not first be evaluated under the procedure set forth in *Lawson / James*, particularly in circumstances where suggestive police procedures are involved.